INHABITANTS OF BELMONT *vs.* INHABITANTS OF VINALHAVEN.

Waldo. Opinion May 7, 1890.

*Pauper. Evidence. Declaration. Voting lists. Presumption of law and facts.*

One of the issues of fact was, whether a pauper, who went from Belmont to Vinalhaven in 1860, gained a settlement in the latter town by residing there five years, continuously between 1860 and 1866.

Between 1866 and 1880 his residence was not very fixed, living at different periods in Vinalhaven, Belmont and other places; he falling in distress in Belmont in 1886. His declarations between 1880 and 1884, as he was going from or back to Belmont, that he was going from or to his home there, would not be admissible as tending to show his home in that town at so remote a period as prior to 1866. But his declarations of the kind, made before the expiration of the five years in 1865 or 1866, or made soon after that period, the conditions of his residence remaining unchanged, would be admissible for such purpose.

The pauper's declarations made after 1880 with acts done in pursuance of such declarations, tending to show a disposition on his part to acquire a settlement in Vinalhaven, and avoid one in Belmont, thereby implying that his settlement was not before that time in Vinalhaven, were admissible to show his bias and prejudice when testifying as a witness (in 1887) to his intention, between 1860 and 1866, of making his permanent home in Vinalhaven; it being admitted that no new settlement was ever acquired by him after 1866.

The voting lists of a town, on which the name of a voter is checked with a cross, are *prima facie* evidence in a case against the town for the support of such voter as a pauper, that the pauper voted at the elections at which such lists were used.

If a person goes from the place of his home to another place for the purpose of laboring in the other place, there is not a presumption of law that he intends to return to the former place when his laboring has ended. There may be some presumption of fact to that effect, an argumentative presumption, stronger or weaker according as it may be, in the belief of the jury, supported by circumstances.

ON EXCEPTIONS.

This was an action to recover for pauper supplies furnished one Daniel Shirley, whose home and pauper settlement, in 1860, were in Belmont. He was never married and his father and mother were dead. His only relatives residing in Belmont were a married sister and her husband. In April or May 1860, he went to Vinalhaven, where, as he testified, he lived from that time until the fall of 1865; having voted there at the state and presidential elections in 1860, and every state election following until 1865; also having paid taxes there during those years. The records of the town of Vinalhaven show that he was taxed there in 1862, 1864 and 1865; and the check lists prepared in August 1860, in August 1863, and in May 1866, contain his name. No absences from Vinalhaven, except such as were temporary, were shown during the above named period; and since the fall of

1865, he lived and worked in various places, sometimes in Belmont, and sometimes in Vinalhaven. He was taxed on the poll list in Belmont in 1867, 1868, 1869, 1870, 1871 and 1874; and chosen a surveyor of lumber in Belmont in 1871 and in 1873.

There was a verdict for the plaintiffs.

The defendants excepted to the instructions of the presiding justice, and to his refusal to give requested instructions, and to the exclusion of testimony offered by the defendants.

The exceptions are stated in the opinion.

*C. E. Littlefield,* for defendants.

There was no evidence that the "check" was the mark used to indicate the man had voted. Check lists required to be kept only one year. R. S., c. 4, § 26. Law first enacted in 1864. All the lists but that of 1866 were prior to that act. .The last one not required, it not being for a September election.

Requested instructions: *Knox* v. *Waldoborough,* 3 Maine, 455; *Worcester* v. *Wilbraham,* 13 Gray, 590.

Excluded testimony: *State* v. *Kingsbury,* 58 Maine, 238; (showing bias, prejudice, partial feeling, interest, etc.) *Drew* v. *Wood,* 26 N. H. 363; *Bersch* v. *State,* 13 Ind. 434; *Folsom* v. *Brawn,* 25 N. H. 114; *Martin* v. *Farnham,* 24 N. H. 191; S. C. 25 N. H. 195; *State* v. *Montgomery,* 28 Mo. 590; *Bishop* v. *State,* 9 Ga. 121; *Hutchinson* v. *Wheeler,* 35 Vt. 330; *Johnson* v. *Wiley,* 74 Ind. 233;. *Nation* v. *People,* 6 Park, (N. Y.) Cr. 258; *Howell* v. *Ashmore,* 22 N. J. L. 261.

*W. H. Fogler,* for plaintiff.

Check lists admitted without objection; their effect being left to the jury.

Requested instructions: *Ripley* v. *Hebron,* 60 Maine, 395.

Excluded testimony: Questions not confined to period 1860 to 1865; answers not tending to discredit witness nor disprove plaintiffs' case; Shirley's statement as to his pauper settlement was an opinion merely.

Shirley, the pauper, testified that from the spring of 1860, to the fall of 1865, his home was in Vinalhaven. He stated with particularity at what places he worked and at what places he

boarded at Vinalhaven during that period. Of course testimony on the part of the defense tending to contradict this testimony is admissible. Upon cross-examination Shirley was interrogated in relation to his pauper settlement. The question and answer which the defendants' counsel makes the text of his argument upon this part of the case relates to that question of pauper settlement, and in no respect to the question of the pauper's home from 1860 to 1865.

An examination of the excluded testimony will show that none of it tended to contradict Shirley upon any point material to the issue.

PETERS, C. J. There was an exclusion of the testimony of several witnesses, at the trial of this case, offered on the question whether Daniel Shirley, a pauper, had a settlement in Vinalhaven, gained between the years 1860 and 1866. This testimony may be examined in classifications.

One portion of it consists of statements of the pauper, made occasionally between the years 1880 and 1886, on his leaving Vinalhaven, the defendant town, to go to Belmont, the plaintiff town, that he was going home, or going home to Belmont. This testimony was no doubt excluded for its remoteness, though no ground of exclusion is stated.

It appears that the pauper never was married, and never possessed much more property than his clothes, always acquiring his living by working out; that he went to Belmont, in 1822, with his father, residing there until the spring of 1860, when he went to Vinalhaven to work, leaving his sister in Belmont, his only relative left there, with whom he had for sometime previously lived. He was in Vinalhaven from 1860 to 1866, and voted there during most of that period, though usually returning to Belmont, once a year at least, on a visit. After the fall of 1866, he was in different places, some years in Vinalhaven, some years in Belmont, and at other times in other places in the vicinity of Belmont, and finally fell in distress in Belmont in 1886. He was taxed on the poll list, in Belmont in 1867, 1868, 1869, 1870, 1871 and 1874. He was chosen a surveyor of lumber in Belmont in 1871 and in 1873.

It will be seen that the situation of the pauper, as to his home, in the period after 1880, was different from what it appears to have been between 1860 and 1866. His declarations after 1880, tending to show a residence at that time in Belmont, would not have much tendency to prove where his residence and home were twenty years prior to that time. The conditions were changed. The pauper had not remained continuously in Vinalhaven from 1860.

Then there is another class of testimony of the same character, but applying to a time so near the period, if not a part of it, relied on by the plaintiffs as fixing the pauper's settlement in Vinalhaven, that we think it should have been admitted. It must be considered that this kind of evidence may have great weight in pauper cases. In close cases, dependent very much upon what may have been the intent of the pauper as to residence, his own testimony, often biased by his wishes and whims at the time he testifies, is apt to have a very controlling effect, unless overcome by other evidence. It is difficult to counteract the pauper's influence as a witness. To do so, a good many acts and expressions of his, when a part of the *res gestae*, have to be woven together, making a web illustrating the pauper's intention, instead of taking his testimony for it. And such evidence should be received with reasonable liberality.

Now, the pauper says he went to Vinalhaven in the spring of 1860, to work for the summer, and that he remained continuously, excepting visits to Belmont, until October 1865. He says he did not intend to stay longer than he had work. It will be reasonably inferred that he did not intend that town as his domicil until some time after his arrival there, and how long after he does not seem able to inform us himself. Mr. Calderwood, called by the defense, says that, when the pauper left town both in the fall of 1865, and in the fall of 1866, he said he was going home to Belmont, and should be back in the spring, if nothing happened more than he knew about. This witness locates the pauper in Vinalhaven during the year 1866 in the same condition and surroundings as in 1865. It is fair to assume that if the pauper had an intentional home in Vinalhaven from any time in 1860 to any

time in 1865, his home continued there, on his own statement, until October 1865, and, on other testimony, until he left in the fall of 1866. His home was just as much in Vinalhaven the day he left, as the day he went there, or as on any day between his going and leaving. This testimony not only proves a fact bearing affirmatively on the issue, but also directly contradicts the pauper, who swears to a continuous home in defendant town until October 1865.

Another class of testimony was offered and refused, which we think should have been admitted, to show the motive and bias under which the pauper testified. Mr. Vinal and Mrs. Vinal testified in their depositions, which were not admitted, that, in 1884, the pauper said he needed two more winters in Vinalhaven to gain a settlement there ; and that he should like to gain a residence in Vinalhaven, for when he got poor he should have to be helped, and that they kept their poor better in Vinalhaven than the farmers did theirs in Belmont, and that he expected soon to become a charge. At about the same time he expressed an interest to Mr. Manson, in having his name on the Vinalhaven voting lists, and got Mr. Manson to have his name entered ; speaking of the matter in connection with a statement about his becoming a town charge. In one or two years after that he becomes a public charge.

This testimony was offered, the case finds, among other purposes, "to show the motive of the pauper in testifying to his intent, and the locality where he intended to gain a residence ;" and for such purpose we deem it admissible. As a witness, the pauper shows a good deal of intelligence about the terms settlement, residence, and intention of residence, and evidently had a leaning for the plaintiffs in the suit. If he expressed an anxiety, in 1884, to become a charge upon Vinalhaven, it would be reasonable to believe he would feel the same anxiety when he testified in 1887,—and that that feeling of preference might color his testimony.

Influences of all kinds are equally objects of consideration in determining how far credibility exists. Says a writer on logic, quoted by Wharton in his book on evidence : "The teacher,

physician, historian and judge have daily occasion to observe how little men are accustomed to describe the simple facts, and how very much they mix up in the statement, unconsciously and unintentionally, their own opinions and interests. It is inconceivably hard, I had almost said impossible, to describe what has been seen or heard wholly as it has been seen and heard. We often introduce our own feelings without anticipating it, and although we have the strongest and purest love of truth." In the case before us, the pauper would not be likely to entertain any motive in 1860 to select Vinalhaven as a residence because a good place to be supported in as a pauper, but the motive would be conceived at the much later period when it seems to have been confessed.

It is competent to impeach a witness by showing his bias. For this purpose it is admissible to prove sympathy, and prejudice as to the particular case, so far as is exhibited by words and acts. Whar. Ev. § 566; and numerous cases cited in note. *Davis* v. *Roby*, 64 Maine, 427. Such evidence is direct and not collateral. Says Wells, J. in *Day* v. *Stickney*, 14 Allen, p. 258: "The credit of a witness, upon whose testimony in part the issue is to be determined, is not merely collateral, and cannot be immaterial. The weight of his testimony with the jury may depend entirely upon their supposition that he is under no influence to prevaricate. If he is prejudiced for or against one of the parties to the suit, or has a strong purpose or feeling of interest in relation to the matter in controversy, it is a circumstance which may materially affect his testimony; and his state of mind ought to be known to the jury. His prejudices can be known only by his expressions of them; and therefore such declarations are the legitimate evidence of their existence. They may be proved in any mode as a direct impeachment, or, if denied by the witness himself, may be proved by other testimony as a contradiction in a material point; which is one mode of impeaching the credit of a witness." This felicitously states the rule and the reason of it.

We think it is not, in this state, necessary to first inquire of the witness whether he has any bias, or has uttered unfavorable expressions, to lay the foundation for the admission of the testi-

mony. But the witness was inquired of very pointedly, and denied all alleged declarations.

There are several points beyond those already discussed, which it may be well to consider, inasmuch as they must appear again upon a new trial.

Some of the check lists of Vinalhaven were introduced by the plaintiffs, on which the name of the pauper appeared as a voter, with the name checked. The court remarked to the jury that the check is the ordinary official indication that the man whose name is on the voting list has voted. That must be correct. The law requires that the name of a voter shall be marked as he votes. R. S., c. 4, § 25. We all know that the usual mark is a dot or a cross at the name, and that such mark is the usual indication that a voter has voted. The town officers are presumed to have done their duty. Whether the marking was a correct one or not in the present case, was for the jury to determine from an inspection of the lists; and any pertinent evidence to explain or contradict them would be competent. The risk of such a rule cannot be much, as the lists are in the possession of the party which would have no motive to tamper with them by adding checks to names.

The defendants' counsel asked for the following instruction: "If the pauper left Belmont and went to Vinalhaven for the purpose of laboring, the legal presumption is, that when the act of laboring is past, he was there with the intention of returning to Belmont, rather than remaining in Vinalhaven." There are but few strictly and purely legal presumptions. It is difficult to divest a merely theoretical proposition of the circumstances that attach to it in the particular case. Most presumptions are mixed of law and fact, or are presumptions of fact which the law may allow a jury to find. The request in this case is so strongly worded as to admit of no qualification or condition. Whether the pauper would return to Belmont would depend upon what Belmont was to him. He might have reason never to return there, or great reason to return. As it was difficult to present the idea as a naked proposition to the minds of the jury, who were already acquainted with all the circumstances, the judge

could not be required to rule as requested. It was a strong argumentative proposition, and a question of presumption arising on the evidence, which the jury could find or not, as they pleased.

*Exceptions sustained.*

VIRGIN, LIBBEY, EMERY and FOSTER, JJ., concurred.